The next matter, number 241598, Stephen Bernitz versus USAble Life et al. At this time, will counsel for the appellant please introduce themselves on the record to begin. May it please the court. Good morning, your honors. My name is Molly Rafik. I represent the appellant, Stephen Bernitz. With your permission, I'd like to reserve two minutes for rebuttal. You may. Thank you. This is a straightforward case, which may seem surprising given the 8,000 page record here. As with any implicit disability case, it starts with the terms of the policy, which is where I would like to start today and then move on to demonstrating how Mr. Bernitz has met his burden of proving that he is disabled under the policy definition of disability. The policy here contains a very lenient definition of disability. It requires Mr. Bernitz to only prove that he is unable to perform just one duty of his occupation. There are three duties that Mr. Bernitz has demonstrated. And that doesn't mean, does that mean his particular job or occupation in a broader sense? It means his particular job, your honor. And that was actually determined by USAble in their vocational review. They did two vocational reviews. And they determined his occupation, which it was, was the senior vice president of development in a pharmaceutical company, which required him to travel 25 to 60 percent of the time. It also required him to sit for prolonged periods of time. And it required him to be able to work full time. And what's important about that is that the ability to work full time is actually in the contract as one material duty of his occupation. So if you look at the five years when they paid benefits, when USAble paid benefits, they evaluated his claim under this policy definition of disability. And I'm going to refer to it as the one-duty standard, because that is what it is. It's one duty. USAble sold the one-duty standard policy to Mr. Bernitz's employee, and they must be held to that standard in reviewing this case. So for the five years of his benefits were paid, they reviewed Mr. Bernitz's claim under the one-duty standard. Nurse Fielding did two reviews, one in 2015, one in 2016. In both reviews, she determined that Mr. Bernitz lacked the ability to sit and stand for prolonged periods of time. In her 2016 review, she determined that Mr. Bernitz could only sit for one to two hours or, as accommodated for paying, and could only stand for 15 to 30 minutes. Those are one duty, or two duties of his occupation. In her 2016 review, she determined that Mr. Bernitz could only sit for one to two hours. Then in October 2017, Dr. Stuart Russell, who works for USAble, conducted a review that I think, of all the reviews in this record, and I regret not spending more time on it in my briefing, but that review in October 2017 by Dr. Stuart Russell, he determines that Mr. Bernitz is unable to sustain full-time work. And he quotes, and I'm just going to quote from that review, he says that based on the significant amount of low back surgical procedures, he is unable to sustain full-time work. It is my opinion that the insured does not have sustained sedentary physical demand capacity and that his impairment will be lifelong. Now, what's important about this review is at the time he conducted this review, Dr. Russell knew a few things. He knew that Mr. Bernitz was traveling frequently. He mentions in his report that Mr. Bernitz made two trips from Boston to San Diego. He also mentions that Mr. Bernitz traveled to Hawaii, which I believe is an error in the record, but nonetheless is referenced in his report. He knew that Mr. Bernitz was walking dogs. He knew Mr. Bernitz was shopping. He knew Mr. Bernitz exercised with a trainer three times a week. And he knew that Mr. Bernitz drove. He also knew that Mr. Bernitz was on the board of two charities. Is the Russell review discussed in either of the decisions? I don't remember seeing it, but I could be wrong about that. It's not, the October 17th decision, 2017 decision is not discussed. And so Russell is doing an intermediate review? Is that just a periodic review that the company does? That's exactly right, Your Honor. But his December 2019 review is the basis for the initial termination of benefits in December 2019. So he changed his mind between 2017 and 2019? That's exactly right. And that's what's relevant here, right? So nothing changed between October 2017 and December 2019 with respect to Mr. Bernitz. So when does the weight loss happen? So the weight loss happens in 2019. In 2018 is when most of the activities that you were able to point to occurred, right? It's January 2018 is when Mr. Bernitz traveled to Baja. He did most of his traveling that he disclosed in early 2019 in January 2019 in 2018. The ALJ's hearing was in June of 2018. That hearing is when the ALJ discussed Mr. Bernitz's activities. They all proceeded June of 2018. There was no difference in Mr. Bernitz's activities between the October 27th review and the December 2019 review. But here's what changed, Your Honor. They stopped, U.S. ABLE stopped reviewing Mr. Bernitz's case under the one-duty standard. In December of 2019, Mr. Bernitz had gone to Africa and the ALJ had denied his benefits. Those are the two fundamental changes in this record. And I will discuss both of them, or if you'd like me to, I can discuss them now. But what I want to point out is in December 2019, Dr. Russell states this. He all of a sudden changes the standard he's reviewing Mr. Bernitz's case on, and he concludes, there are currently no physical or behavioral health conditions that are precluding, producing restrictions and limitations precluding full-time, light physical demand occupations. This is not the one-duty standard he had been applying to date, or U.S. ABLE had been applying. U.S. ABLE did not question Dr. Russell. They didn't question the standard he applied. Instead, they relied on his report to deny benefits, and they themselves also did not apply the one-duty standard. What standard would you say is stated in that evaluation? This is just a general, he cannot do any light duty occupation generally. And it implies all duties of that occupation, which is what the district court did and what U.S. ABLE does as well. So U.S. ABLE has argued in its brief, Your Honor, that we absolutely apply the one-duty standard, but they offer this court no citations of having done so. Well, they'll say they placed it in the decision. I mean, they definitely quote it. Oh, sure. But that's also required by the regulations, Your Honor. So here's what the regulations say. You must quote the plan definitions that you rely upon. But they also say, and this court has said, you need to apply that standard to the facts. So what does that look like? Because I'll be just they say, listen, he's flying to Africa to go on two-week-long surgeries. Sorry, safaris. He's going on long walks. He is going to the gym. He is serving on multiple boards. He is taking classes. He is an active, apparently engaged person. And so if he can do all of that, he can do this job. And maybe you're going to say they're missing the he can do this job part, but it seems like those facts that they line up seem to line up with, well, he can work at that job. So the question isn't he can work at that job. The question is, can he perform, is he unable to perform just one duty of those jobs? So you say he can't do it all day long. That's one duty. Absolutely. And he cannot. So I'm just trying to think what that requires to meet their sort of their burden. So do they have to say those magic words? Do we imply that by their conclusion where they say this is all the stuff we've observed and figured out about him? You know, or do they have to, you know, go, I mean, go. Like, how do you how do you prove that? It's a really good question, Your Honor, and I struggled with this in every case because the standard, of course, is it's abuse of discretion and their decision has to be based on the substantial evidence in the record. Right. And so here they will say the substantial evidence is exactly what you said. But excuse me, if they've concluded that he can do the job, even though that does not include a discrete analysis of each particular requirement of the job, isn't that tantamount to saying that there's no evidence here that he cannot perform one of the essential duties of the job? That conclusion, which is required by the standard of the policy, seems to me implicit in that general conclusion. Isn't the logic of that pretty much inescapable? I agree with that, Your Honor. So I do agree with that. They're saying he can do the job, right? And implicit in that is he is unable to perform one duty of the job, if I understand your question correctly. He is not unable. He's not able to perform one duty of the job. But that isn't the analysis that happened. So when they did that analysis with the same information, with all the information except for the trip to Africa, they determined he was unable to perform one duty of the job. And if you look at the actual evidence, and Judge Lopez, you have been clear about this, you need to delve beneath the surface. You can't just superficially look at the evidence. So if you look at the surveillance, he does leave. He does exactly what he has told them he's able to do. He goes to a one-hour workout with his therapist or his personal trainer. He volunteers for an hour. He's home by 1230. He doesn't leave the rest of the day. And he doesn't leave the following two days. There's nothing on surveillance that shows him consecutively doing anything. They have said he can't work a full day. They said that up to 2017, 19, whatever. They've said that. You would say, if you're going to reverse that, you need real evidence that he can work a full day in showing that he goes out of the house for an hour or that he goes on one long plane flight one time. Those things are not a sufficient basis to reverse what you had previously decided. I would say that in a general ERISA case, that wouldn't be the standard. I'm not asking this court to make a broad proclamation in that regard. But in this case, yes. Because in 2017, based on the same information, they found the opposite. They found that he couldn't sustain full-time work. But counsel, before they made the initial, they made the decision that they're going to not continue to provide the benefits, there's an appeal process. And as part of that initial determination in the appeal process, there is an independent medical evaluation that is done. That's important, is it not? It's one way of dealing with the structural conflict issue. You seem to impugn the real independence of those to evaluation. Why were they not independent? There's several reasons, Your Honor. But let me start with the most important. I have problems both with the independence of the evaluators, but more importantly with the substance of their reviews. So you start with Dr. Kaplan, Dr. Richard Kaplan, who was retained because Dr. McGuire, who works for U.S. ABLE, was unable to make a determination as to whether Mr. Bernietz could sustain full-time work. So they retained Dr. Kaplan to review this file. Dr. Kaplan is a life care planner, he's a physiatrist. He conducted ten reviews in this case. Nine out of the ten reviews are focused on Mr. Bernietz's neuropsychological cognitive functioning, which is not, and he has never said that he is disabled due to cognitive limitations. But that is what Dr. Kaplan bases nine out of the ten of his reviews on. He is not a I thought he primarily focused on his physical condition, but acknowledged there may be some neurological problems and suggested that there be further review of that should be done. And that was done at his suggestion, was it not? Well, so it was a little different than that, Your Honor. His first review, the December 2020 review, actually focused on the physical conditions. After that, U.S. ABLE asked him, sent him the reports, and kept asking him to comment on Mr. Bernietz's pain. These are the questions they asked him. And to comment on his chronic back problems. Instead, Dr. Kaplan responds regarding Mr. Bernietz's neuropsychological conditions, his cognitive functioning. And so what happens is Mr. Bernietz starts to experience memory changes in 2021. His neurologist refers him for neuropsychological testing, which is postponed because he ruptured two discs in his back and undergoes a spinal fusion. Dr. Kaplan then says it's suspicious that he's canceled this testing, because if he actually had pain, it would show up on the neuropsychological testing, so why doesn't he do the testing? I'm sorry, Your Honor. Would you like me to finish? Yes. And so he questions it. And then when the neuropsychological testing actually happens, Dr. Kaplan says, hold back. Actually, the only neuropsychological testing that would be valid is if he wasn't on pain medication. But he was on pain medication when he first suggested that Mr. Bernietz undergo the testing. He also then says only a forensic neuropsychological evaluation would be relevant. But it doesn't matter, because Mr. Bernietz was never saying that he was totally disabled due to a cognitive condition. Is there any significance to the Social Security disability ruling? It seems to me the sort of rubric for analysis in that case and this one are just different. Entirely different, Your Honor. So there's two reasons I think that the ALJ opinion is important, or three reasons. The first is the ALJ found that Mr. Bernietz could not perform a light-duty occupation. The ALJ found after listening to all the evidence that is before you, Your Honor, he listened to all the evidence of Mr. Bernietz's travel. In fact, this is where U.S. ABLE got most of the evidence regarding Mr. Bernietz's travel. He heard everything about Mr. Bernietz's activities, and he still determined that Mr. Bernietz could not do a light-duty occupation. He said Mr. Bernietz could do a sedentary occupation with some restrictions. The second relevant piece of evidence is that U.S. ABLE itself said during the internal review here, it did not rely on the Social Security determination of disability to deny benefits. And that's right, right, because you've talked about the one-duty standard. That has nothing to do with the Social Security determination, right? No, the Social Security determination is can you do any occupation, sedentary or otherwise. Mr. Bernietz must only prove that he can't do one occupation. But I would say that the ALJ sat there and listened and made factual findings about all the activities Mr. Bernietz did. And in many ways, that is such good evidence for us because he sat there and listened to Mr. Bernietz, and he said, look, even based on all of your activities taken as a whole, you still cannot do a light-duty occupation as a whole, not just one duty. You can't do a light-duty occupation. Is his present job a light-duty occupation? It's a light-duty occupation. So you're saying that basically Social Security, yeah, they said you don't get benefits, but the reason you don't get benefits would still entitle you to benefits under U.S. ABLE's policy. That's exactly right. One has no relevance to the other other than he evaluated the evidence. So the duties he can't perform are full-time work, the amount of travel that's required. And sitting for prolonged periods of time or standing for prolonged periods of time. And I would direct you to the functional capacity evaluations, one that was done in March of 2020 and one that was done in June. Any response to their claim in the reports that there just wasn't sufficient validation of that test to make it valuable? So if you look at the actual report, the examiner did validity testing. That just happened to be different than whatever U.S. ABLE has required in this case or said is missing in this case. She did her own form of validity testing. But even if you decide that the functional capacity testing is not relevant because she didn't test Mr. Bernietz's heartbeat, what's relevant is that functional capacity test was ordered by Mr. Bernietz's interventional pain specialist, was sent to him after. And he says this exam is consistent with what I know about Mr. Bernietz, what I have treated him for for the prior five years. And let's remember he was seeing him on a monthly basis. I have never had an ERISA case, I've done this work for 28 years, I've never had a case with this much evidence. He's seeing his doctor monthly. He's taking 30 milligrams of oxymorphone a day, which is three times as strong as oxycodone, which is what he started on in 2014 when he was disabled. By 2019, he's taking oxymorphone. He's taking tramadol. He's taking muscle relaxants. He's getting all kinds of spinal injections, and I should probably stop talking. Thank you, Your Honors. Thank you, counsel. At this time, would counsel for the appellees please introduce themselves on the record to begin. May it please the Court, my name is Scott Pomeroy, I'm the attorney for the defendant in this case, U.S. Able Life. I'd like to talk about a couple of things. First, the deferential standard, how U.S. Able Life, the reasonableness of their decision, and also maybe address some of the other issues raised by plaintiff's counsel if we have time. I want to talk about the deferential standard first because plaintiff's argument in the briefs in here today is based on this idea that Mr. Bernitz, here's the evidence to prove his burden, and that's not what the purpose of judicial review is. In ERISA, where the plan confers discretionary authority on the administrator, it's the administrator's job to exercise the discretion. I mean, the argument I heard was it's an abuse of the discretionary authority of the company that decides a person is not disabled without applying its own plan standard. That's the argument which, if correct, would be, I would say, an abuse of the discretionary authority. That's the argument, and I think it is incorrect, as you pointed out. I mean, the determination letters quote the standard, of course they apply the standard. That is not a... I'm trying to, in a kind of ritual way, just quote the standard, but then if the subsequent analysis does not reveal that that's actually what's being done here, that's still problematic. I mean, just quoting the standard doesn't really get you very far. I understand what you're saying, but I don't believe that's what happened here. The determination letters are very lengthy. They talk about a lot of the evidence in the case. As was mentioned, there's an 8,000-page record. This is an extremely large record. And I want to talk about some of the information that's in the record, because I think there's this misimpression that plaintiff tries to convey that somehow all the information was always there from the beginning, and that there was somehow this change, and the only plausible explanation is that they stopped applying the terms of the policy. That's not actually right. If you compare Dr. Russell's first report in 2017 to his second report in 2019, he lays out what the evidence in the record is at those two times. And the evidence is, and he talks about it and does his analysis based on it, and the evidence is very different. It's a dramatically different case with two years of additional information. As mentioned, the travel vaccinations for the Baja beach vacation happened after Dr. Russell's first report. The Social Security decision, which lists a whole lot of information, happened several months after the first report, and then plaintiff waited another six months or five months before submitting that to U.S. ABLE. And then, of course, there's the African trip, there's the contemporary upset. What do you think your burden is to, I read all of that, and that's true, and I sort of explained those things to your friend, but what is the burden of the company to link those changes in his condition to the job to somehow justify the idea that now he can work full time? Okay, he went on a trip. Okay, he goes to board meetings. This is another theme that comes up in the plaintiff's briefing, which is this attempt to reverse the burden. The burden is on the plaintiff to show the extent of his inability, the extent of his limitations. It is not the burden of... But she says that you already decided that in 2017, and now you have a few more flights and he's doing a little better, and that's all true, but if you're going to reverse course, I think she'd say, you need to explain why you're turning course, which is different than sort of an initial determination. Is there anything to that? I believe if you read Dr. Russell's two reports, he actually does a third report also before the initial determination by Mr. Emma. But those two reports bookend an enormous amount of new information that comes into the case, and he does discuss that, and all that is discussed by Mr. Emma also in the initial determination. And then afterwards, there is, as you point out, an appeal, and in the appeal there was initially Dr. McGuire who said there's a lot of conflicting evidence, particularly conflict between the early evidence which shows a high level of incapacity versus the later evidence which, you know, the plaintiff continues to claim that he can't sit for more than an hour and has to lie down most of the day while he's taking trips to Africa and to Baja and to Hawaii and Grand Canyon and wherever else. He said, so Dr. McGuire says, you know, what would really be useful here would be if we could get an IME, an individual examination, and U.S. ABLE requested that. There's a dispute over, you know, what it means to refuse or not, but in any event, U.S. ABLE did not deny benefits on his not appearing for the IME. It said, well, let's get another doctor, and they got Dr. Kaplan, and he was brought in to review the physical conditions, because at the time, that was the claim, was the physical conditions. Let me ask about Dr. Kaplan. I mean, the point is made, I'd be interested in knowing how these independent medical examiners are secured. I mean, Appellant points out that your client specifically requested that Dr. Kaplan do this review. Doesn't that raise some question about his true independence, if the company specifically requested a doctor to conduct the independent medical evaluation? I'm not sure that it does. And I think the reason is because the doctors work through a third-party vendor who secures them. Why would the company not leave it up to the vendor rather than requesting a specific doctor? Well, they lost the kind of doctor that they need for the kind of review that needs to be done, and they needed a review of a physiatrist. They needed a review to replace an IME that they weren't going to get because the plaintiff refused. And so I think some of that weighs into that decision. But when you get Dr. Kaplan's report, it again goes through all the evidence in the record at that point. He explains why he makes the decision he makes. It is an exhaustive review. And in the context of that, he also talks about cognitive, because as the claim went on in the appeal, there was this claim of cognitive impairment that was made. And Dr. Kaplan pointed out, well, there's no cognitive testing. And it was in response to Dr. Kaplan that plaintiffs said, well, don't make a decision yet. We're going to get some neurocognitive testing. And the Montreal Cognitive Assessment came back normal. They said, don't make a decision yet. We're going to get more. And eventually, some 10 or 15 months into the appeal, Dr. Beckin's report comes. And it's being submitted in response to something that Dr. Kaplan had said. So of course they're going to give that to Dr. Kaplan. But they didn't rely exclusively on Dr. Kaplan's view either, because it was a different kind of medicine, a different kind of doctor. We need to get a neurocognitive doctor. And that's why Dr. Spicka was engaged to provide. And then there was this long round of responses and replies and responses between Spicka, Kaplan, and Beckin. Counsel, can I ask, you refer to the 8,000-page record here. It's my impression that your client opened up the appeal process in a way that it was not formally required to do. I get that impression from the briefs. Is that correct to you? You could have, consistent with the rules, you could have conducted a much more limited appellate process. But my sense is that you actually did open it up quite a bit. Yes, Your Honor. U.S. ABLE bent over backwards to give the plaintiff absolutely every opportunity to submit everything he wanted, extension after extension, and then rounds and rounds of back and forth. There's sort of no issue that was left, no stone left unturned in this. It was an exhaustive review. Which I guess is why your friend doesn't really challenge that. I think what she challenges, what the plaintiff challenges, Your Honor, is whether the plaintiff met his burden. And the plaintiff is trying to entice this court to gauge in sort of a de novo in sheep's clothing. Well, otherwise stated, I think she said, you're not applying the standard that you're playing with. That's what the plan requires. So there were some new facts, but there wasn't enough there for the company to flip its view because it didn't appear, it didn't go through and really evaluate. Why is it the case that traveling to Africa or serving on a board means he can't work full-time? And if that's a duty, then it seems to me for it to be a reasonable, thoughtful decision, I have to explain why does this new evidence show that he can now do the duty that the company said he couldn't previously do? That's what I understood the core argument to be. I understand that, but one of the questions, your question is, well, what's the one duty? I mean, this goes back to who has the initial burden in establishing entitlement to benefits. It's the claimant, you should say, this is the duty I can't do. So I asked that before your friend sat down. I can't sit, I can't work full-time. Actually, could you point us maybe to where that test was applied? I would point to the determination letters. And where in the determination letters? Mr. Emma's letter, Ms. Kasterman's first letter, and then Ms. Kasterman's second letter is where that's applied. I mean, I think the evidence here, for instance, the travel, where the claim is that the job, what elevates this job to a light-duty occupation rather than an ordinary sedentary kind of occupation is this need for occasional travel. And it's like if you have one trip somewhere, maybe that has some relevance. But when you have multiple trips to national and international vacations, you have, you know, well, that presents a different picture. It ties, in this case, particularly to that travel requirement where the question is sitting or inability to sit or stand, and you've got contemporaneous medical records from Dr. Fujioka and Dr. Shaw that he's out playing pickleball and he's engaging in other kinds of exercise activities. That shows, there's this, another kind of reversal of the evidence that a plaintiff tries to say, well, you know, we'll look at something else. She resisted that. Hold on one second. She resisted that and said, I'm not asking for some big proclamation. What I'm saying is there had been a long prehistory to this case in which certain determinations were made about this guy, which is he couldn't do these things. And now we're going to say he can. And I sort of pose to her, well, is it enough to say, well, of course he can, because we can imply all of it, because he went on trips, he served on boards, he's doing exercise. There's no sort of implicit reasoning going on. It's all laid out explicitly. There's an enormous amount of additional information. Do you think if I read that, it's going to tell me somewhere, because he can do those things, he can work full time? I think if you read Dr. Russell's reports, the one before and the one after, you'll see that the evidence that he's looking at in those two reports are very different. It's not a mystery or something you have to imagine as to why he changed his mind. It's very obvious in his reasoning. And the doctor's not the one who applies the standard of the policy. That's the claim professional who makes that determination based on information obtained from the doctor. They consult the doctors for their opinions, which they consider in making the determination. But it's the claim professional who makes the decision, and it's those determination letters where the standard is applied. The standard is stated. I guess we'll have to figure out if I think the standard was applied. They're not exactly the same thing as Judge Lopez pointed out. You could state the standard. But to me, a reasonable decision means you considered the duties and you matched them up to the new evidence, and you say the new evidence, then you could be wrong about that and still win. But the matching has to happen somewhere, and I guess that's what I'm worried about. Well, I guess the question is, what are you matching it up to? I mean, the letters do respond to the arguments that were made during the administration. There is a matching of the arguments of plaintiff's counsel throughout the administration in the appeal. Those arguments might be different here and there. I mean, you're not going to have an exact matchup for today's arguments with what's in the letter, because the letter was addressing something that was before the administrator at the time. My time is up. Thank you. At this time, would counsel for appellant please reintroduce herself on the record to begin? She has a two-minute rebuttal. Thank you, Your Honors. I wanted to just address three facts. First, the travel. The travel, I have no problem with U.S. ABLE investigating the travel. They should have investigated the travel. A trip to Africa could be glaringly problematic, but what they didn't do, again, is delve beneath the surface. They didn't look at what Mr. Bernice had to do to engage in that travel. He rested the accommodations that he made to take that travel, both before, by curtailing his activities, both during, by tremendous accommodations, including resting every afternoon, and what happened after. He was unable to even sit for five minutes in his following PT evaluation, and he needed epidural steroid injections. Work travel is very different than vacation travel. Second, the activities. Again, Dr. Russell in 2017 knew Mr. Bernice was driving. All of a sudden, in 2019, he said driving shows that he can actually do the duties of his occupation. It doesn't make any sense. Either you can drive or you can't drive. It has no bearing on its occupation. Counsel, it seems to me implicit in your argument is the proposition that when benefits have been provided for four or five years, whatever it was, and then a company decides to terminate, that they have a heightened burden of explanation for that decision to justify a termination after benefits have been provided. They have to do a particularly good job, for example, of linking the evidence and their analysis to the specific standard of the plan that justifies the benefits. Are you making that kind of argument? I'm not, Your Honor. I would like to. I would like that to be the rule, and I think there are courts throughout the country that have said, if the burden is on the insurer to show that something has changed, I'm not asking this court to do that. I'm not asking this court to place a higher burden on U.S. ABLE when they're going to terminate benefits. I'm just asking them to conduct the review that's required by the policy and to delve beneath the surface of just what looks superficially to be an improvement in his condition. So it wasn't the travel itself is not the problem, or the ability to work out is not the problem. It's what all those things have meant throughout the course of the claim and whether those activities actually demonstrate that he is unable to perform one duty of his occupation. When they are applying the plan terms correctly, he is disabled. When they are not applying the plan terms correctly, he is no longer disabled, and the ALJ determination supports that. So I don't think that's a set fast rule, but I would like the court to say delve beneath the surface on an abusive discretion case. Thank you.